## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BROOKLINE OPPORTUNITIES, LLC; and TAMPOSI BROTHERS HOLDINGS, LLC,<br><br>                Plaintiffs,<br><br>     v.<br><br>TOWN OF BROOKLINE, NEW HAMPSHIRE; PLANNING BOARD OF THE TOWN OF BROOKLINE; and SELECTBOARD OF THE TOWN OF BROOKLINE,<br><br>                Defendants. | Civ. Action No. _____<br><br>**COMPLAINT**<br>Jury Trial Demanded |

## INTRODUCTION

1.     This action arises out of the unlawful and discriminatory actions of Defendants Town of Brookline, Planning Board of the Town of Brookline and Selectboard of the Town of Brookline ("Defendants" or the "Town"), which have prevented Plaintiffs Brookline Opportunities, LLC and Tamposi Brothers Holdings, LLC ("Plaintiffs" or "Tamposis") from constructing a multi-family affordable housing development in Brookline, New Hampshire. Despite the Fair Housing Act's prohibition against familial status discrimination, the Town explicitly blocked Plaintiffs' workforce housing project based on the assertion that the development would attract too many families with children.

2.     In 2020, the Tamposis began plans to develop an 80-unit affordable townhome development in the Town of Brookline, which is an affluent, predominantly white suburb of Nashua, New Hampshire. The proposed development—intended to qualify as "workforce

housing" under New Hampshire law—would serve the area's low-income families, who are disproportionately African American and Latino.

3.      Immediately after Plaintiffs presented conceptual plans to Brookline officials in early 2021, Brookline residents began a vehement, well-organized campaign to stop the development. The opponents succeeded in persuading Brookline officials to set a special town meeting where the Town voted to impose a one-year moratorium on residential developments intended for occupancy by families and that may have an impact on schools, to direct the Planning Board to establish special conditions for approval for workforce housing developments, and to deny all workforce housing applications if the town believes it meets its fair share of the regional need for affordable housing, effectively preventing the Tamposis' development proposal. The Town justified the moratorium and new ordinances on the claim that a development like the Tamposis' would bring more families to Brookline and overcrowd Brookline's schools.

4.      Lower-income residents of Brookline and the surrounding area have a profound need for affordable housing. In a 2017 audit, for example, the Brookline Planning Board and the Nashua Regional Planning Commission (the "NRPC") jointly wrote that "Brookline is experiencing the same issue that all of New Hampshire is experiencing, where high housing costs are creating a barrier to young families with children." Indeed, Brookline's current Master Plan indicates that 83 percent of renters in Brookline are rent-burdened, meaning their housing costs make up at least 30 percent of their income.

5.      The New Hampshire legislature has passed a law requiring municipalities like Brookline to allow the development of affordable housing, including the development for rental multi-family housing, and the NRPC has estimated Brookline's "fair share" of the regional

workforce housing need to be over 800 units. During the March 2021 Special Town Meeting called to respond to the Tamposis' workforce housing proposal, the sponsor of four petition warrant articles intended to impose a moratorium and enact ordinances containing procedural and substantive obstacles to the Tamposis' development asserted that Brookline has already met its fair share as established by the NRPC. While it was supported by other members of Town Meeting, that assertion is entirely baseless.

6.      Despite the documented need for affordable housing in Brookline, not a single workforce housing development has been built in the Town, and Brookline lacks any multi-family housing with five or more units. Existing restrictions maintained by the Town limit any potential development of multi-family workforce housing to a small handful of parcels along the Town's Route 13 corridor.

7.      The absence of affordable housing in Brookline disproportionately burdens families of color, who are overrepresented among low-income households and have the greatest need for affordable housing in the area. Brookline is significantly segregated, being approximately 93 percent white as compared to the surrounding Hillsborough County, which is 84 percent white. Nearby Nashua is just 73 percent white. The Tamposis' proposed affordable housing development would increase racial integration in Brookline.

8.      Plaintiffs' proposed development would help address the need for affordable housing in Brookline. Plaintiffs undertook a months-long planning process for the development, including entering a contract to purchase the subject parcel, designing the community, seeking out necessary financing, and being prepared to meet or exceed every requirement of Brookline's workforce housing zoning ordinance and related regulations.

3

9.      But as soon as Plaintiffs' development plans became public, fierce community opposition arose. The opposition was explicitly based on discriminatory attitudes toward families with children, immigrants, and people of color. Opponents suggested that allowing affordable housing to be built would increase crime, lower property values and increase taxes, and allow lower income children to overcrowd Brookline's schools.

10.     For example, members of the public opined that "workforce housing is going to flood our school with people," and expressed the need for "protecting the children who are here." One member of the public commented, "As someone who grew up in Lowell, MA I have a full appreciation for what housing projects can do for a community – poverty, crime and the DRUGS!" Others commented that a workforce housing development would not be in line with maintaining the "character" of Brookline, and that the development would "lead to Brookline looking like Nashua." And others asked if Plaintiffs' proposal was part of a plan to bring "immigrants" and "refugees" to Brookline.

11.     Amidst the backlash, a series of petition warrant articles—proposals to be voted on at the annual Town Meeting—to prevent the project were proposed. The petition warrant articles were based on the incorrect assertion that Brookline schools could not accommodate the number of children that would live in Plaintiffs' proposed community and that Brookline already had its fair share of workforce housing.

12.     Although the petition warrant articles were submitted well after the designated deadline, the Town Selectboard voted in favor of holding a "special town meeting" to put them up for a town vote. Town officials—including the Planning Board and School Board—then held a series of public meetings to discuss the supposed impacts of the proposed workforce housing

and build support for the moratorium and ordinances, without notifying Plaintiffs that the moratoria were being considered or that the meetings were taking place.

13.     Following the Planning Board's recommendation to enact the moratorium and ordinances, the Town Meeting voted to impose a one-year moratorium on residential development in Brookline and to create specific restrictions specifically targeted at workforce housing. The moratorium and ordinances are explicitly based on the concern that additional development—and Plaintiffs' proposed workforce housing in particular—would attract more families with children to Brookline and "significantly impact the ability of the Town of Brookline to provide adequate school services[.]" That concern is entirely unfounded.

14.     Town officials and the Town Meeting concluded that: (1) K-6 enrollment in Brookline is projected to increase from 557 to 618 over the next 18 months, and (2) some of the projected class sizes for the next school year "exceed the specifications outlined" in School Board policy.

15.     Those factual claims are incorrect. Brookline's K-6 is enrollment is projected to increase to 618 **by 2025-2026**, not in the next 18 months. Additionally, the Town had an enrollment of over 618 as recently as 2010. Far from being overrun, Brookline schools have seen a 12.2 percent *decline* in enrollment since 2008. Moreover, contrary to what Brookline officials suggested, Brookline School Board policy does not dictate class size. The policy simply outlines "recommended guidelines" on class size—guidelines that are substantially below the maximum class sizes set by the State of New Hampshire. Thus, in addition to being facially discriminatory against families with children, the Town's justification for the moratorium simply does not align with the facts.

16.     Nevertheless, the moratorium and ordinances passed at the Special Town Meeting on March 28, 2021 and have achieved their end goal: to prevent Plaintiffs from proceeding with the proposed workforce housing development. Because of the moratorium and ordinances, Plaintiffs cannot submit a compliant application for approval to the Planning Board. The Planning Board was directed to create new restrictive conditions on workforce housing proposals and are currently in the process of approving conditions that would make workforce housing economically infeasible, including a requirement that all workforce housing developments are comprised of at least 50% one-bedroom units (effectively making them unavailable to families with children). In addition, one of the ordinances approved at the Special Town Meeting prohibits all workforce housing if the Town concludes it meets its fair share of such housing, a condition that members of the Town Meeting falsely asserted had been met. Without Planning Board approval, Plaintiffs cannot submit a viable final application for Low-Income Housing Tax Credit funding through the New Hampshire Housing Finance Authority ("NHHFA"). As a result, Plaintiffs cannot exercise their option to purchase the subject parcel by the designated deadline.

17.     Defendants' actions have caused Plaintiffs to suffer substantial and irreparable loss and injury. For example, Plaintiffs will lose substantial pre-development investments made to identify a suitable parcel for the development, negotiate and draft an option contract, and hire engineers and other consultants to examine the parcel. Plaintiffs have also suffered damage to their reputations and forgone other opportunities while they focused on the proposed development in Brookline. Moreover, Defendants' actions have caused irreparable injury to families with children, African Americans, and Latinos in the area by depriving them of desperately needed affordable housing.

18.     Defendants' actions to block Plaintiffs' proposed workforce housing development constitute unlawful discrimination against potential residents on the basis of familial status, race, and national origin, in violation of federal fair housing law, and will have a disparate impact on families with children and racial minorities, in violation of that same law. Defendants' actions also have the purpose and effect of perpetuating racial and ethnic segregation in Brookline by denying families of color the opportunity to live in the overwhelmingly white community. Defendants' discriminatory actions also constitute unlawful interference with Plaintiffs' ability to develop affordable housing.

19.     Plaintiffs seek a declaratory judgment, injunctive relief, and damages for Defendants' unlawful behavior. This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-3631.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the claims arose in the District, Defendants are incorporated in and reside in this District, Plaintiffs do business in this District, and a substantial part of the events giving rise to this action occurred in the District.

## PARTIES

22.     Brookline Opportunities, LLC is a New Hampshire domestic limited liability company established for the purpose of developing workforce rental housing on an undeveloped parcel of land, located along New Hampshire Route 13 near the intersection of North Mason Road in the Town of Brookline.

23.     Tamposi Brothers Holdings, LLC is a real estate development and investment company focusing on residential development in Greater Boston and the surrounding towns. In addition to the development it proposes in Brookline, Tamposi Brothers Holdings, LLC and its principals are currently involved in the development of numerous other real estate development projects in the region, including both market rate and affordable housing.

24.     The Town of Brookline is a town in Hillsborough County in the State of New Hampshire. It was incorporated in 1769, consists of approximately 20 square miles, and has a population of approximately 5,000 residents. Brookline operates under a Town Meeting form of government, with a Town Meeting acting as the legislature and a five-member Selectboard acting as the executive branch.

25.     The Planning Board of the Town of Brookline ensures compliance with the Town's Planning and Zoning regulations and ordinances when reviewing site plans and subdivision applications. Under the Town's Subdivision Regulations, the Planning Board has final authority to approve proposed developments, including the development proposed by the Tamposis. On information and belief, the Planning Board consists of two co-chairs, two members, the Town Planner and three alternate members.

26.     The Selectboard manages the prudential affairs of the Town.

## FACTUAL BACKGROUND

### Plaintiffs' Proposed Affordable Housing Development

27.     Plaintiffs' proposed development was designed to be a community of 80 rental townhomes located on a portion of a 126-acre property off of New Hampshire Route 13. The townhomes would be "Traditional and Efficient," with "Design features that Respect Town Character." Plaintiffs' design would incorporate consideration of the character of the Town and

be architecturally consistent with traditional Town buildings. The development included a
community building, large buffers, and a substantial area (over 30 acres) of protected open
space.

28.     Brookline's Land Use and Zoning Ordinance allows multi-family workforce
housing only on sites that are greater than 10 acres and that are within 500 feet of Route 13.
Plaintiffs' proposed development site is one of the only parcels in the entire Town that satisfy
these criteria and that could support a large development. Consistent with Brookline's Land Use
and Zoning Ordinance, which allows for five units per multi-family building, the proposed
community would consist of five townhomes in each of 16 separate structures. Plaintiffs
proposed to provide adequate water and ensure proper drainage through construction of a
community well and a stormwater management area on the property.

29.     Seventy-five percent of the units would be available to families earning up to 60
percent of the area median income ($65,760 for a three-bedroom unit) and rent for some units
would be affordable to families earning only 30 percent of the area median income ($29,650 for
a two-bedroom unit).

30.     Plaintiffs plan to seek an allocation of Low-Income Housing Tax Credits
("LIHTC") to help finance construction of the proposed development. The LIHTC program was
created by the United States Congress in 1986 to promote the development of affordable housing
for low-income individuals and families. The core function of the program is to make tax credits
available to housing developers who keep a certain percentage of newly developed housing
affordable to those who are low income.

31.     In New Hampshire, the LIHTC program is administered by NHHFA. The
Authority considers a variety of factors when determining whether to award tax credits to a

particular affordable housing developer, including project location, housing need characteristics, whether greater than 25 percent of the units would have 2 or more bedrooms, whether the project would contribute to community development, and whether the project would have an energy efficient design and construction.

32.     Plaintiffs are experienced in developing affordable housing and designed the proposed Brookline development with the goal of satisfying LIHTC program requirements. Were it not for Defendants' actions as outlined herein, the development would have scored sufficiently high on New Hampshire's Qualified Allocation Plan to obtain a tax credit award during the 2022 funding cycle.

### The Need for Affordable Housing in Brookline

33.     The New Hampshire legislature has recognized the need for affordable housing statewide, and that need is especially pronounced in Brookline, where over 99 percent of the housing stock consists of single-family homes. As described by the Brookline Planning Board and the Nashua Regional Planning Commission, "Brookline is experiencing the same issue that all of New Hampshire is experiencing, where high housing costs are creating a barrier to young families with children."

34.     Brookline's Master Plan states that 83.3 percent of renter-occupied households in Brookline are cost-burdened—meaning they spend more than 30 percent of their income on housing costs—and that "[n]o other municipality in the Nashua Region has a greater percent" of such households. And according to the 2019-2020 Biennial Housing Plan authored by NHHFA, less than 15 percent of two-bedroom rental units in Brookline are affordable to median income households.

35.     As recently as 2019, the NRPC estimated that Brookline's workforce housing need was 774 units in 2017, growing to 852 units by 2025. These figures, which are contained in the NRPC's 2019 Housing Needs Assessment, represent the NRPC's "best estimate" of "the number of affordable units [communities] should be providing for their residents."

36.     There is also significant demand for affordable housing units in Hillsborough County. There are only four multi-family, affordable housing developments that are not age-restricted and allow families with children in nearby towns, and they have waitlists that can exceed one year.

37.     Despite this demand, multi-family housing is virtually non-existent in Brookline. Only *eight* out of 1,777 total housing units in Brookline are multi-family, according to American Community Survey data. None of these units is in multi-family structures containing more than four units. The rest—over 99 percent—are single-family homes. It is no surprise, then, that the 2017 audit report authored by the Brookline Planning Board and the Nashua Regional Planning Commission states that Brookline "should encourage multifamily and more affordable housing options" in town.

38.     African American and Latino households are much more likely to be renters than white households in Brookline. Similarly, African American and Latino households in Brookline are much more likely than white households to have incomes at or below 60 percent of area median. A Black family in the housing market is over 60% more likely to qualify for the affordable units than a white family in the housing market, and a Latino family in the housing market is over 75% more likely to qualify for the affordable units than a white family in the housing market. As a result, the absence of affordable rental housing in Brookline disproportionately harms African American and Latino households.

39.     In addition, the demographics of Brookline and the surrounding area reflect patterns of residential segregation. Brookline's population is overwhelmingly white. According to American Community Survey data, about 93.3 percent of Brookline residents are white, 2.1 percent are Latino, 1 percent are African American/Black and 3.6 percent are other race.[1] Brookline has a significantly higher percentage of white residents and significantly lower percentage of African American and Latino residents than Hillsborough County as a whole, which is an estimated 83.8 percent white, 7.3 percent Latino, and 3.2 percent African American. Nashua, the closest city to Brookline, is 73.2 percent white, 12.7 percent Latino, and 4.1 percent African American. The dissimilarity index shows an extremely high level of segregation of African Americans in the area and a very high level of segregation of Latinos in the area.

40.     These trends carry over to the demographics of Brookline's school population. Just 3.9 percent of Brookline students are Latino and less than 1 percent are African American. The vast majority—over 95 percent—are white.

**Brookline's Workforce Housing Ordinance and the Process for Seeking Approval**

41.     Brookline has an ordinance governing the development of workforce housing within the Town. *See* Brookline Zoning and Land Use Ordinance ("Zoning Ordinance") § 620.00. The stated purpose of the ordinance is to, *inter alia*, "[p]rovide for the opportunity for the development of affordable workforce housing" and "[a]ddress the regional need for

---

[1] Except where otherwise noted, population estimates and racial percentages refer to 2015-2019 American Community Survey 5-Year Estimates from the U.S. Census Bureau *available at* https://data.census.gov/. Throughout this Complaint, except where otherwise noted, "white" refers to non-Hispanic white, "African American" refers to non-Hispanic African American/Black, "Hispanic" refers to Hispanic/Latino of any race, and "other race" refers to non-Hispanic individuals of any other race or of multiple races.

workforce housing as documented in the Nashua Regional Planning Commission's most recent Needs Assessment." Zoning Ordinance § 621.00.

42.     Among other things, the Zoning Ordinance defines where workforce housing can be located within Brookline and what sort of technical land use requirements it must satisfy, such as minimum parcel size requirements, minimum lot size requirements, and requirements regarding architectural style. Among these requirements, multi-family housing is only permitted on parcels exceeding 10 acres and within 500 feet of Route 13. *See id. at* §§ 623.00, 626.00.

43.     Per the ordinance, an application seeking approval of a workforce housing development will follow the Town's "normal application procedure for a subdivision approval as defined in the Town's Subdivision Regulations." *Id.* at § 624.00.

44.     Under the Town's Subdivision Regulations, the Brookline Planning Board has final authority to approve proposed developments. *See* Subdivision Regulations § 4.1.01.

45.     The Subdivision Regulations lay out a three-step process for seeking subdivision approval from the Planning Board: (1) a "Preliminary Conceptual Consultation Phase," (2) a "Design Review Phase," and (3) a "Final Phase" in which a final application is submitted to the Planning Board for approval. *Id.* at § 3.1.02.

46.     The "Preliminary Conceptual Consultation Phase" is optional but "encouraged." *Id.* at §§ 3.1.26-27. This first phase, which involves an appearance before the Planning Board with no obligations, is "intended to provide an open forum for the discussion of general concepts of a proposed subdivision and suggestions which might be of assistance in resolving problems with meeting requirements during final consideration, prior to the formal application procedure." *Id.* § 3.1.27.

13

47.    The "Design Review Phase" is also optional but "strongly encouraged." *Id.* at § 3.1.28. Also before the Planning Board, this phase "provides for non-binding discussions with the applicant and is intended to provide an open forum for the discussion of all technical requirements and engineering details applicable to the subdivision prior to the formal application." *Id.*

48.    The "Final Phase" involves submission of a final application to the Planning Board and is "intended to ensure that all technical requirements, state approvals, and legal data have been submitted as required." *Id.* at § 3.1.29. The final application consists of, among other things, a final plat; copies of all applicable federal, state, and local approvals and permits; a traffic study (if required by the Board); and a "fiscal impact analysis" (if required by the Board). *See id.* at § 4.6.

49.    In addition to reviewing final applications for conformance with technical land use requirements, the Subdivision Regulations state that the Planning Board "shall . . . review all proposed subdivisions with a view toward determining the impact that the proposed subdivision will have on various Town services[.]" *Id.* at § 3.1.01.

50.    More specifically, the Planning Board is tasked with determining whether the proposed subdivision would: (a) "[c]onstitute a scattered or premature subdivision of land as would involve danger or injury to health, safety, or prosperity by reason of the lack of water supply, drainage, transportation, schools, fire protection, or other public services," or (b) "[n]ecessitate an excessive or unreasonable expenditure of public funds for the supply of such services." *Id.*

14

**Early Steps to Seek Local Approval**

51.     Plaintiffs first reached out to Brookline officials about the proposed development on December 26, 2020, informing the Town Planner they were "working on a workforce housing project in town" and hoped "to set up a meeting with staff to review the concept to [get] some feedback early in the evaluation." The express goal of the meeting was to "meet with everyone who can attend to get as much feedback as possible."

52.     Plaintiffs and their consultant, Chad Branon, met with the Town Planner, the Building Inspector, the Department of Public Works Director, the Police Department, and the Fire Department on January 4, 2021. During that meeting, Mr. Branon reviewed conceptual plans that provided key information about the proposed development, including its location and layout, the number of structures and units contemplated, and initial design considerations. The meeting was constructive and focused primarily on technical aspects of the development and zoning ordinances. The topic of the number of school-age children who would reside in the development was discussed, as well as impact on town services. Plaintiffs specifically discussed the fact that a decision to prevent a housing development based on the number of children it may attract would violate the fair housing prohibitions against familial status discrimination. Procedurally, Plaintiffs were directed to continue developing their plans and be prepared to present the conceptual plan to the Conservation Commission and the Planning Board as the next steps in the development process.

53.     Later that day, Mr. Branon notified the Town Planner that Plaintiffs planned to go forward with a conceptual hearing with the Planning Board and wanted to move forward with an "independent fiscal impact study" to provide the data that would answer questions that came up in the initial meeting.

54.     At the Town Planner's suggestion, Plaintiffs and Mr. Branon also appeared before Brookline's Conservation Commission on February 9, 2021. During that meeting, Plaintiffs and their representatives presented conceptual plans for the proposed development for the purpose of getting the Commission's feedback. The Commission asked a number of questions about the proposed development, including what Plaintiffs planned to do with the open space on the property, whether there would be public access to the property, how far beneath the surface they had hit bedrock, and how Plaintiffs planned to deal with stormwater.

55.     After the meeting, Mr. Branon followed up to seek written comments from the Conservation Commission, but none was provided. Plaintiffs never received any objections or concerns raised by the Conservation Commission.

56.     Plaintiffs then appeared before the Planning Board on February 18, 2021 to discuss the proposed project. Plaintiffs and their representatives presented a conceptual plan of the development and discussed how the project would help meet the need for affordable housing in Brookline. Plaintiffs further described how taking any action against a housing development because of the number of children who might live there would violate the fair housing laws. The Planning Board asked questions on the technical aspects of the development and how the development would be taxed.

**Discriminatory Opposition to the Proposed Development Builds**

57.     Around the time of the February 18, 2021 Planning Board meeting, the community learned of the proposed project and immediately began a forceful campaign to prevent the development.

58.     Many community members expressed opposition to the proposed workforce housing community using racially charged language and employing insidious racial stereotypes

and code words about the types of tenants who would live in affordable housing. These included references to public and affordable housing in predominantly minority communities, fears of increases in crime, concerns about declining property values, and fears that Brookline schools would be overrun by children moving to the proposed development.

59.     The morning of the February 18 hearing before the Planning Board, a community member posted a message on the Brookline New Hampshire Facebook page stating, "Socialists wanted work force housing and now they will get it. . . . This is obviously not in line with maintaining the character of Brookline." The post also provided information about the February 18 Planning Board meeting, as well as a Zoom link to view the proceedings online. Several people responded with comments in opposition to workforce housing, including:

a.  "As someone who grew up in Lowell, MA I have a full appreciation for what housing projects can do for a community – poverty, crime and the DRUGS! And then there's the taxes we get to pay for the increase in public servants needed to contain the mess! . . . It took 40+ years to get it done, but they finally razed the projects in Lowell."

b.  "[D]oes this have anything to do with Biden's plan to flood our country with 'refugees' like what's been talked about these past few weeks? Timing of this project being so rushed seems a little suspect…"

c.  "Stop that workforce housing project by any means necessary."

d.  "Keep your low income housing in cities because that's what we will turn into. No [sic] to mention over running the schools. We will be the next Merrimack if this shit gets started. . . . This seems like a social engineering tool to move people into smaller towns from cities honestly."

e.  "These changes will lead to Brookline looking like Nashua in no time. Overcrowded and overtaxed."

f.  "The problem with homes that have capped rent on them is the people who live there will be residents and allowed to vote in every budget and spending increase without worry about paying for it . . . . I grew up in Nashua and certainly don't want to see Brookline turn into it."

g.  "I am not for adding 'work force Housing' for many reasons such as bringing down our town value. . . I'd love to see some 55+ communities come to town, they will pay their share of property taxes but not add to the school system, and typically those communities have a higher standard on property beautification."

h.  "Building this workforce housing is going to flood our school with people. They are going to pay taxes based on their income not on the value of the property. This will create a problem. Towns people need to make a choice."

i.  "Why work force housing when we so obviously need senior housing? Senior housing means no impact on school . . . less crime impact."

60.  During the February 18 Planning Board meeting, members of the public voiced concerns in the Zoom comments about outsiders—particularly low-income outsiders—coming to live in Brookline. For example:

a.  "[W]ork force is a nice way to say low income. and I am sorry but low income comes with baggage. you don't call an Apple and orange. you call it an orange."

b.  "[C]oncerning that current residents have so many (yet to be addressed) concerns yet the units do not even have to be sold to people that work or are from this community."

c.  "Yes, please represent the CURRENT members of the community"

d.  "I don't want to see Brookline with no services to be the dumping ground for the workforce working in surrounding towns.

"

61.  On February 19, 2021, in response to someone posting an article about the proposed development on the Brookline Facebook page, one user commented, "Is this part of the plan to integrate immigrants into neighborhoods?"

**The Proposed Moratorium and Ordinances and Town Officials' Response to Opposition**

*The One-Year Moratorium is Introduced*

62.  On February 22, 2021, four days after the February 18 Planning Board Meeting, the Town Selectboard received two e-mails from Peter D'Agostino, a Brookline resident, asking

the Selectboard to add four petition warrant articles to the annual town meeting warrant, which would be subject to vote on March 27, 2021. The four warrant articles—aimed squarely at preventing Plaintiffs from proceeding with their workforce housing project—contained the following key questions:

      a.  Article 1 asked whether the Town of Brookline should "impose a 365-day moratorium on any development that is intended to qualify as workforce housing under the Town of Brookline, NH Zoning and Land Use Ordinance?"

      b.  Article 2 asked whether the Town of Brookline should "establish a Study Committee for the review of the Town's compliance with RSA 674:59 [the workforce housing statute] or any other business related thereto?"

      c.  Article 3 asked whether the Town of Brookline should "direct the Planning Board to enforce Reasonable Standards and Conditions of Approval in accordance with RSA 674:59 IV, including but not limited to Environmental Protection, Water Supply, Sanitary Disposal, Traffic Safety and Fire and Life Safety Protection on any development that is intended to qualify as workforce housing under the Town of Brookline, NH Zoning and Land Use Ordinance?"

      d.  Article 4 asked whether the Town of Brookline should "direct the Planning Board to not approve any development that is intended to qualify as workforce housing under the Town of Brookline, NH Zoning and Land Use Ordinance if the Town meets its fair share of the current and reasonably foreseeable regional need for such housing under the provisions of RSA 674:59 III?"

63.     On February 22, 2021, the Selectboard voted 3-2 not to include these four, untimely petition warrant articles on the annual town meeting warrant because the deadline for petition warrant articles was February 2, and because the Selectboard had already signed the annual meeting warrant.

64.     Nevertheless, on February 24, 2021, Mr. D'Agostino e-mailed the petition warrant articles to the Selectboard again and again asked that the petition warrant articles be put on the town meeting warrant.

65.     During a March 1, 2021 meeting, the Selectboard began to backtrack on its February 22 vote to reject the petition warrant articles. After some discussion the Selectboard

tabled further discussion until the March 8, 2021 Selectboard meeting, where the Selectboard voted 5-0 to hold a special town meeting on March 28, 2021 to vote on the four petition warrant articles "submitted after the deadline."

66.    Although the petition warrant articles were explicitly directed at Plaintiffs' proposed development, Plaintiffs and their representatives were never notified of any of the meetings regarding the articles and were not present.

***Town Officials Lobby for a Moratorium Based on Claims of School Overcrowding***

67.    Over the following two weeks, the Brookline Planning Board and School Board held a series of meetings to discuss the perceived impact of the workforce housing development and the merits of the proposed moratorium. Again, Plaintiffs were not given notice of the meetings and in their absence, Town officials and members of the public lobbied for a one-year moratorium and other restrictions on workforce housing, coalescing around the unsupported, misleading claims that the workforce housing development would cause overcrowding in Brookline schools and that the Town had already met its fair share workforce housing obligation.

68.    The School Board ultimately voted to support "a moratorium on the 80-unit workforce housing development" and a "study committee to review the impact of the 80-unit workforce housing on the Brookline school system." The factual basis for the School Board's decision was outlined in a March 17, 2021 letter from the School Superintendent to the Planning Board. In the letter, the Superintendent explained that K-6 enrollment was "projected to go from 557 to 618." The letter also stated that "[l]ooking into next school year, some of our projected class sizes are greater than the specifications outlined in School Board Policy IIB and other projected class sizes are just below the specifications." In a follow-up letter dated March 22, 2021, the Superintendent wrote that he "believe[d]" that "projections indicate that the increase in

student enrollment will occur over the next 18 months." The letter also asserted that School Board Policy IIB "dictates class sizes by grade."

69.     Following the School Board's decision, the Planning Board issued written "findings" and a recommendation on the proposed moratorium. The Planning Board's findings stated that, "Based on information provided by the Brookline School Board and the School Administrative Unit . . . continued development will significantly impact the ability of the Town of Brookline to provide adequate school services within the Brookline School District." The findings reiterated the Superintendent's assertion that "the K-6 enrollment in Brookline is projected to increase from 557 to 618 over the next 18 months." The findings also stated that, "According to the Superintendent's letters, this could require potentially 3 additional classroom sections; some of the project class sizes for the next school year exceed the specifications outlined in School Board Policy IIB."

70.     Based on these "findings," the Planning Board recommended that the Town Meeting establish a moratorium on all new single-family and multi-family housing development for a period of one year. Unlike the School Board, the Planning Board deliberately sanitized its findings and recommendation of any direct reference to the proposed workforce housing project, to avoid the perception that it was singling out workforce housing. But the recommended moratorium was nonetheless targeted at workforce housing in general and Plaintiffs' proposed development in particular. Indeed, it included exceptions designed to allow for non-workforce housing developments, including accessory dwelling units, housing for older persons, and any other development that in the Planning Board's judgment would have "minimal or no impact on the ability of the Town of Brookline to provide adequate school services within the Brookline School District."

21

***Town Meeting Passes the Moratorium and Ordinances***

71.     A special session of Town Meeting was held on March 28, 2021, to vote on the proposed moratorium and associated warrant articles.

72.     At the meeting, Brookline residents again publicly opposed the proposed workforce housing development because it would attract families with children. One resident stated, "[w]hat drove me to Brookline was the school district. Hearing the impact is not going to make us as desirable to those families coming in for real estate, for our own development for our own family. . . . I just don't want to see our kids suffer because we didn't do everything we could . . . ." Mr. D'Agostino was even more direct, stating "When a prior speaker said 'we're targeting children'-- I sure as hell hope so!  That's what we're here to do . . . we are protecting the children who are here, who are afforded an opportunity[.]"

73.     The Town Meeting ultimately voted to pass an ordinance establishing the moratorium recommended by the Planning Board, i.e., a "moratorium on the issuance of building permits for new single family or multi-family housing and the granting of site plan and subdivision approvals within the Town of Brookline for a period of 365 days which shall be effective immediately[.]" As recommended by the Planning Board, the ordinance contains exceptions for accessory dwelling units, housing for older persons, and "those types or categories of development that have minimal or no impact on the ability of the Town of Brookline to provide adequate school services within the Brookline School District."

74.     In addition to the moratorium, which prohibited the Planning Board from approving any workforce housing developments for a period of 365 days, the Town Meeting also voted to pass an ordinance directing the Planning Board "to enforce Reasonable Standards and Conditions of Approval…, including but not limited to Environmental Protection, Water Supply,

22

Sanitary Disposal, Traffic Safety and Fire and Life Safety Protection on any development that is intended to qualify as workforce housing…" in the future. No similar requirement was established for market rate housing or developments intended for occupancy by seniors.

75.     Pursuant to this ordinance, the Planning Board is considering—at the time of the filing of this complaint—a specific set of additional restrictions that would apply only to developments with a workforce housing component. Those provisions include, requiring that any workforce housing development have at least 50% of units no larger than one-bedroom (effectively making those units unavailable to families with children), more restrictive parcel, frontage and lot size requirements, and a prohibition on backlot development. The Planning Board is also considering special environmental protection, water supply, sanitary disposal, traffic safety, and fire and life safety protection conditions that would only apply to workforce housing developments. None of these new standards would apply to market rate developments or subdivisions, and they do not apply under the current workforce housing ordinance.

76.     The Town Meeting also approved an ordinance stating that no workforce housing proposal may be approved if the Town "meets its fair share of the current and reasonably foreseeable regional need for such housing…or if, when combined with the current housing stock, the development would exceed the Town's fair share of the current and reasonably foreseeable regional need for such housing…" The ordinance did not indicate who or what body would determine whether the Town met is affordable housing fair share, but members of the Town Meeting indicated their understanding that the Town already met its fair share. The Planning Board is currently considering an ordinance that would vest the annual fair share determination within the complete discretion of the Planning Board.

77.     The explicit motivating factor behind the moratorium and ordinances was to stop more families with children from moving to Brookline. Indeed, the motion for passage of the warrant articles repeated the information about school enrollment and class size that was contained in the Superintendent's March 17 letter.

78.     Based on this information, the motion repeated the claim that the articles were needed because "continued development will significantly impact the ability of the Town of Brookline to provide adequate school services within the Brookline School District."

79.     In short, the moratorium and ordinances' express purpose was to prevent families with children from moving to Brookline, and specifically into Plaintiffs' proposed development.

### The School-Overcrowding Concern is a Fiction

80.     The moratorium and ordinances were built on assertions about children and school capacity that are demonstrably false and misleading.

81.     The claim that K-6 enrollment was projected to increase from 557 to 618 "over the next 18 months" was based on projections provided by the New England School Development Council (NESDEC) that actually said that Brookline's K-6 enrollment would increase to 618 ***by 2025-2026.***

82.     Moreover, far from reaching maximum capacity, Brookline schools have seen enrollment *decline* by 12.2 percent since 2008. In fact, the projected enrollment of 618 by 2025-2026 is well below the number of students that Brookline had accommodated as recently as 2010. As the following chart (which Plaintiffs presented to the Planning Board) demonstrates, Brookline's pre-K through elementary enrollment has trended downward for the last ten years.

**Brookline Elementary School Enrollment (Pre-K thru Elementary)**



Data from New Hampshire Department of Education Fall Enrollment Statistics; Pre-K and Elementary School data is for Brookline District; Middle and High
School data is for Hollis-Brookline Cooperative District

11

83.    In addition, the separate claim that "some of the projected class sizes" would

"exceed the specifications outlined in School Board Policy IIB" was misleading at best. School

Board Policy IIB does not specify or "dictate" maximum class sizes, as the Superintendent stated

in his March 22 letter to the Planning Board. Nor does it state that class sizes above a certain

threshold threaten the ability of Brookline schools to provide "adequate" services. Instead, it sets

"recommended guidelines" to be utilized by school administrators when "initiating a discussion

to determine if any further action should be taken relative to class size." As shown in the table

below, the policy's "recommended guidelines" are well below the maximum class sizes set by

New Hampshire regulations:

| Grade | Brookline Guidelines | Max under N.H. Regulations |
|---|---|---|
| K-1 | 17 | 25 (strive for 20 or fewer) |
| 2 | 20 | 25 (strive for 20 or fewer) |
| 3 | 20 | 30 (strive for 25 or fewer) |
| 4-5 | 23 | 30 (strive for 25 or fewer) |
| 6 | 23 | 30 |
| Remainder | N/A | 30 |

*See* N.H. Code of Admin. Rules, Section ED 306.17.

84.     The supposed "specifications" in School Board Policy IIB—which Town officials used to support the moratorium and ordinances—are not obligatory. They are nothing more than recommended guidelines voluntarily adopted by the Brookline School Board. The mere possibility that those guidelines would be exceeded for some classrooms simply does not support the conclusion that the proposed workforce housing would "significantly impact" Brookline's ability to provide "adequate school services."

**The Effect of the Moratorium and Ordinances**

85.     The effects of the moratorium and ordinances have been significant. The moratorium and ordinances are preventing Plaintiffs from moving forward with their proposed workforce housing development. The moratorium and ordinances were specifically designed to stop Plaintiffs from building workforce housing and the Town made clear that it would not act on any attempts to seek approval for the proposed development. The chairman of the Planning Board recently stated that by default, a proposal like the Tamposis' would not be approved

because it does not fit within one of the exemptions to the moratorium. As the Chairman stated, "by default, a building permit is a no."

86.     The Tamposis also could not submit a compliant application to the Planning Board because the Planning Board had been directed by the new ordinance to enforce new, unstated conditions on workforce housing. In addition, the Town Meeting participants indicated that the Town had already met its fair share of affordable housing, which under the new ordinance would require the denial of any new workforce housing proposals. Any application to the Planning Board for workforce housing would fail during the moratorium, could not comply with unknown standards, and would be futile in light of the Town's interpretation of its affordable housing fair share requirements.

87.     Without the local approvals and site control, Plaintiffs' application for tax credits under the LIHTC program would fail, making such an application futile. Without local approval and without an award of tax credits this cycle, Plaintiffs cannot close on the subject parcel by the designated closing date in their purchase agreement and will lose their option to purchase the parcel. Meanwhile, housing in Brookline continues to be unaffordable for most low-income individuals and families in the area, who are disproportionately African American and Latino.

88.     Defendants' moratorium and ordinances prevent Plaintiffs from submitting a viable application for an award of LIHTC funding and prevent Plaintiffs from engaging in other necessary pre-development activities. As a result, Plaintiffs cannot exercise the option to purchase the subject parcel, which was designed to be contingent on receiving the necessary approvals and LIHTC award.

89.     Defendants' imposition of the moratorium and ordinances on certain workforce housing, which preclude the development of Plaintiffs' proposed multi-family housing

27

development, have the purpose and effect of limiting housing opportunities for families with children, African Americans, and Latinos and perpetuating racial residential segregation in the Town of Brookline.

**INJURY TO PLAINTIFFS**

90.     As a proximate result of the acts and practices described above, Plaintiffs have suffered, continue to suffer, and will suffer in the future, great and irreparable loss and injury, including but not limited to, economic losses, a deprivation of Plaintiffs' right to develop affordable housing for families with children that is racially integrated and free from discrimination based on familial status, race, and national origin, and interference with Plaintiffs' attempts to provide safe affordable housing for new and existing residents of the Town of Brookline. Defendants' actions also injure the intended beneficiaries of Plaintiffs' proposed Brookline development.

91.     Plaintiffs expended substantial time and resources to locate a parcel where they were permitted to develop an affordable housing community in order to provide housing options for households making 60 percent of the area median income or less. Plaintiffs paid to negotiate, draft, and enter an option to purchase contract, but with the impact of the new ordinances and the moratorium in place, Plaintiffs would not be able to utilize the property for the purpose of developing the project, and therefore, cannot exercise the option to purchase in an economically sensible manner.

92.     Plaintiffs invested significant funds in pre-development activities, including retaining engineers to examine the property for access to water and other utilities, site lines, grades, wetlands, and other conditions, retaining a hydrologist to assess water availability at the

property, retaining a land use attorney to assist in title work and permitting, and retaining an architect to draw concept plans for the development.

93.     Plaintiffs, their owners, and officers have lost opportunities to build similar projects on different parcels in another jurisdiction because they invested their time and resources in the Brookline project. Plaintiffs and their owners and officers have also been unable to pursue other projects that would have been their focus if they had not expended their time on developing the Brookline project and responding to Brookline's moratoria.

94.     Defendants' blocking of Plaintiffs' Brookline development has caused harm to Plaintiffs' business reputation. In particular, any developer who takes a parcel off the market through an option to purchase contract, but fails to actually exercise the option, is less likely to find willing sellers in the future. This exacerbates the existing difficulty of there being few owners of suitable parcels who are willing to enter into the type of contingent contract necessary for a LIHTC project.

95.     Defendants' blocking of Plaintiffs' Brookline development has caused harm to Plaintiffs' ability to develop a LIHTC project in other states that require the developer to have completed one LIHTC development prior to applying to build a project.

96.     Were it not for Defendants' blocking the development, Plaintiffs would have been awarded a developer fee that they will not receive because they cannot even apply to build the project with the ordinances and while the moratorium is in place. The deadline for the preliminary LIHTC application has already passed, and the final application deadline will pass prior to the expiration of the moratorium. Plaintiffs also lose all other financial and economic benefits of a LIHTC award.

97.     Plaintiffs have lost future income as a result of Defendants' actions. As the owners of the Brookline workforce housing project, Plaintiffs would have received 90 percent of the income from the property for the first fifteen years of its existence. Plaintiffs intended to purchase the development after the 15-year LIHTC compliance period and then would have received 100 percent of the income generated by the project.

98.     Plaintiffs continue to seek to build the proposed Brookline workforce housing development. Defendants' actions prevent Plaintiffs from pursuing the development, which would provide much-needed housing opportunities for lower income families and individuals in Brookline and surrounding areas.

99.     The loss of housing opportunities to the disproportionate number of families with children, African Americans, and Latinos due to unlawful discrimination constitutes an irreparable harm to those groups. Plaintiffs' development of the workforce housing project would provide desperately needed affordable housing to such households in the area.

## CAUSES OF ACTION

### First Cause of Action
### Fair Housing Act, 42 U.S.C. § 3604

100.     Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 99 as fully set forth herein.

101.     Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

102.    Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

103.    Defendants' are further liable under 42 U.S.C. § 3604(c), which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination," based on statements made publicly or otherwise endorsed in public by Brookline officials.

104.    Defendants' actions to block Plaintiffs' proposed workforce housing development are and have been based on discriminatory motives related to the race, color, national origin, and familial status of the likely tenants of the proposed community, specifically the likelihood that the tenant population of the community will include many families with children, African Americans, and Latinos.

105.    Defendants' actions also impose disproportionate harms on families with children, African Americans, and Latinos by making affordable housing in Brookline unavailable to those groups, with the effect of perpetuating segregation in Brookline.

106.    Defendants' conduct was intentional, willful, and in reckless disregard of the known rights of others.

**Second Cause of Action**
**Fair Housing Act, 42 U.S.C. § 3617**

107.    Plaintiffs reallege and incorporate the facts and allegations contained in paragraphs 1 through 99 as fully set forth herein.

108.     Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3617, under which:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Defendants' actions have interfered with Plaintiffs' efforts to build and operate a workforce housing development that would disproportionately benefit African Americans, Latinos, and families with children, and constitute retaliation against Plaintiffs for proposing a project that would serve these groups.

109.     Defendants' actions interfering with Plaintiffs' proposed workforce housing development are and have been based on discriminatory motives related to the race, national origin, and familial status of the likely tenants of the development, specifically the likelihood that the tenant population of development will include many African Americans, Latinos, and families with children.

110.     Defendants' actions interfering with the project also impose disproportionate harms on African Americans, Latinos, and families with children by making affordable housing in Brookline unavailable to those groups, with the effect of impeding racial desegregation in the Brookline.

111.     Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     enter a declaratory judgment that the actions of Defendants complained of herein are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-3631;

(b)     issue a preliminary and permanent injunction restraining Defendants, their agents, employees, representatives, and successors, or any other person acting directly or indirectly with them from unlawfully interfering with Plaintiffs' development and from taking any further action that would hinder, delay, or obstruct the Plaintiffs' development of the proposed workforce housing community, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including, but not limited to, lifting the one-year moratorium on development in Brookline, rescinding the ordinances that target workforce housing with specific and unwarranted conditions and requirements, and fairly evaluating Plaintiffs' application under the Zoning Ordinance and associated regulations as they existed on the date the moratorium was enacted and under New Hampshire's workforce housing statute RSA § 674: 58-61.

(c)     award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

(d)     award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(e)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

Dated:  September 21, 2021

Respectfully submitted,

<u>/s Megan Carrier</u>
Megan C. Carrier (NH Bar No. 20352)
Sheehan Phinney Bass & Green PA
(603) 627-8103
1000 Elm Street, 17th Floor
Manchester, NH 03101
mcarrier@sheehan.com

Reed Colfax*
Michael Allen*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
rcolfax@relmanlaw.com
mallen@relmanlaw.com

*Motions for *Pro hac vice* Admission to be
submitted

*Attorneys for Plaintiffs Brookline Opportunities, LLC and Tamposi Brothers Holdings, LLC*