# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Brookline Opportunities, LLC et al.**

     v.                          Case No. 21-cv-770-PB
                                        Opinion No. 2023 DNH 81P

**Town of Brookline et al.**

## MEMORANDUM AND ORDER

The plaintiffs in this case are two real estate development companies that are attempting to build an affordable rental housing development in Brookline, New Hampshire. The Town of Brookline ("Brookline") reacted to the proposed development by adopting a one-year moratorium on the issuance of new building permits and approval of new site plan and subdivision applications. Before the moratorium expired, Brookline adopted a growth management ordinance that severely limits new residential construction. The plaintiffs responded with this suit against Brookline, its Planning Board, and its Selectboard (collectively, "the Town"). The complaint alleges that the Town violated the Fair Housing Act, 42 U.S.C. § 3601 et seq., by using the moratorium and the growth management ordinance to discriminate against the likely tenants of the proposed development because of their familial status, race, and national origin.

The parties have filed cross-motions for summary judgment. The Town contends that the plaintiffs lack standing and their claims are not ripe for judicial review. The plaintiffs argue that they are entitled to partial summary judgment on their familial status discrimination claims. With one minor exception, I deny both motions.

## I.     BACKGROUND

### A.    Workforce Housing

New Hampshire has adopted a workforce housing law to address the state-wide need for affordable housing. Under this law, every municipality in the state must "provide reasonable and realistic opportunities for the development of workforce housing, including rental multi-family housing." N.H. Rev. Stat. Ann. § 674:59, I. Workforce housing is defined in relevant part as "rental housing which is affordable to a household with an income of no more than 60 percent of the median income for a 3-person household for the metropolitan area or county in which the housing is located." Id. at § 674:58, IV. A municipality is in compliance with the statute if its "existing housing stock is sufficient to accommodate its fair share of the current and reasonably foreseeable regional need for such housing." Id. at § 674:59, III.

Brookline has adopted a workforce housing ordinance ("WHO") that authorizes the development of workforce housing in the residential-agricultural district under certain circumstances. See Doc. 40-4 at § 621.00

2

(2020 version); Doc. 48-14 at § 623 (2022 version). When built as multi-family dwellings, workforce housing is allowed "only along the NH Route 13 corridor," which is "defined as land in the Residential/Agricultural District within 500 feet of the NH Route 13 right of way on both sides of the highway." Doc. 40-4 at § 623.00; accord Doc. 48-14 at § 624(1)(b).

The WHO requires developers who seek to build workforce housing to follow Brookline's regular procedures for obtaining site plan and subdivision approvals. See Doc. 40-4 at § 624.00; Doc. 48-14 at § 625(4). The version of the WHO that was in effect in 2021 did not limit the overall size of workforce housing developments, so long as they met certain parcel size, lot size, and building setback requirements. See Doc. 40-4 at § 626.00.

## B.    The Project and the Town's Response

Plaintiffs Brookline Opportunities, LLC and Tamposi Brothers Holdings, LLC (collectively, "the Developers") are real estate development companies run by Joseph and Jacob Tamposi. The Developers acquired an option to buy two parcels of land consisting of more than 100 acres located off New Hampshire Route 13 in Brookline. They seek to develop the property as rental workforce housing. After expending significant time and effort and engaging various consultants to perform studies for the project, the Developers started the application process with Brookline in early 2021. As part of this process, they presented a conceptual plan to various Brookline

3

officials and the Planning Board, proposing to develop 80 multi-family workforce rental units that would be built in two 40-unit phases.[1] The Developers plan to fund the project by using federal and state low-income housing tax credits.

Brookline officials and a number of residents quickly mobilized in opposition to the project. At a special Town Meeting held in March 2021, residents voted to adopt an ordinance establishing "a moratorium on the issuance of building permits for new single-family or multi-family housing and the granting of site plan and subdivision approvals within the Town of Brookline for a period of 365 days which shall be effective immediately." Doc. 42-15 at 4. The stated rationale for the moratorium was that "continued development will significantly impact the ability of the Town of Brookline to provide adequate school services." Id. The moratorium exempted applications for "housing for older persons"[2] and provided that the Planning Board may

---

[1]    The Town's subdivision regulations encourage, but do not require, such a "preliminary conceptual consultation" with the Planning Board. See Town of Brookline, N.H., Subdivision Regulations, at § 3.1.02 (2013). This consultation is "intended to provide an open forum for the discussion of general concepts of a proposed subdivision and suggestions which might be of assistance in resolving problems with meeting requirements during final consideration, prior to the formal application procedure." Id. at § 3.1.27.

[2]    The Town's zoning laws define "housing for older persons" as housing that "restricts the occupancy of units within a development specifically designed for older persons . . . where units are intended for, and occupied by at least one person 55 years of age or older per unit." Doc. 40-4 at § 2202.01.

also exempt developments with "minimal or no impact on the ability of the Town of Brookline to provide adequate school services." Id. at 5. To address the circumstances that gave rise to the moratorium, the ordinance instructed the Brookline School District to form a facilities study committee to examine classroom space issues, and the Planning Board to obtain a study of school and town services focused on Brookline's capacity to accommodate growth. Id.

While the moratorium was in place, the Planning Board appointed a school and town services study committee and tasked it with determining whether Brookline should regulate the timing of development. The study committee eventually submitted a growth management study report to the Planning Board. The report cited data showing a "rapid growth rate" in Brookline, and the first consequence it listed was rising school enrollment and the resulting "strain being placed on the classroom space." Doc. 42-28 at 8. The report also cited the impact of rapid growth on the availability of potable water, increased usage of the emergency services, and understaffing in the public works department. Id. at 9-10. Based on its determination that population growth "is outpacing [Brookline's] ability to scale school and town service capacities," the committee recommended that Brookline should (1) adopt a new growth management ordinance ("GMO"),[3] and (2) revise its

---

[3]      The Town's prior GMO had expired in 2011.

WHO to allow workforce housing only if, in Brookline's estimation, it falls short of fulfilling its fair share of the regional workforce housing need. See id. at 10-12.

Brookline residents voted to adopt the new GMO in March 2022. The "Purpose" section of the GMO states that it was "deemed necessary to manage the rate of growth" in order to allow Brookline to (1) "plan for increase in school facilities and services," (2) plan for increases in other town services, and (3) "ensure that Brookline does not receive more than its fair share of the regional population growth." Doc. 48-14 at § 1401. On the issue of school capacity, the GMO cited an increase of 14.2% in school enrollment over the prior five years and noted concerns about adequate classroom space for special needs students, as well as an overall lack of space for educational needs. Id.[4]

The GMO substantially limits the construction of new residential housing in Brookline. See Doc. 48-14 at § 1405. It caps the total number of residential building permits available each year and requires phasing for developments containing more than two proposed dwelling units. Id. In

---

[4]    A GMO cannot pass in New Hampshire unless the Planning Board makes a finding of a "lack of capacity to accommodate anticipated growth." N.H. Rev. Stat. Ann. § 674:22. The Planning Board relied on the study committee's report to establish the need to regulate growth. Compare Doc. 48-14 at § 1401, with Doc. 42-28 at 8-10.

addition, the GMO caps the total number of permits that any given project may receive at six in the first year and five in subsequent years. Id. at § 1406.00. As such, an 80-unit development like the one the Developers proposed would require a minimum of 16 years to be completed. By capping permits and requiring phasing, the GMO effectively precludes developments financed with low-income housing tax credits. See Doc. 42-39 at 17-20. Like the moratorium, the GMO exempted housing for older persons from its restrictions. See Doc. 48-14 at § 1403.00.[5]

Simultaneously with the GMO, Brookline passed a revised WHO. Under the revised WHO, if the Planning Board determines that Brookline has met its fair share of the regional need for workforce housing, it cannot approve any workforce housing applications. See Doc. 48-14 at § 625.00. Shortly after, the Planning Board determined that Brookline had met its fair share of workforce housing based on its existing housing stock. Doc. 48 at 4.

## C.   The Complaint

The Developers' complaint alleges that the Town violated the Federal Fair Housing Act ("FHA") by using the moratorium and the GMO to

---

[5]      Prior to the enactment of the GMO, both housing for older persons and workforce housing were exempted from any GMO. See Doc. 40-4 at §§ 626.00, 2206.00. When the GMO was enacted, the WHO was amended to remove the prior GMO exemption. Compare Doc. 40-4 at § 626.00, with Doc. 48-14 at § 626.00. Housing for older persons, however, retained its exemption. See Doc. 48-14 at §§ 2206.00, 1403.00.

discriminate against families with children, Blacks, and Latinos who will lease units in the proposed development. Count I alleges a violation of § 3604 of the FHA on the grounds that the Town has (1) denied or otherwise made unavailable housing to the Developers' likely tenants based on their familial status, race, and national origin, see 42 U.S.C. § 3604(a); (2) discriminated against those tenants "in the terms, conditions, or privileges of . . . a rental of a dwelling" based on their familial status, race, and national origin, see id. at § 3604(b), and (3) made public statements disfavoring those tenants based on their familial status, race, and national origin, see id. at § 3604(c). Count II asserts a violation of § 3617 of the FHA, based on the Town's alleged interference with the Developers' efforts to build a workforce housing project that would disproportionately benefit families with children, Blacks, and Latinos. See id. at § 3617. Among other forms of relief, the Developers seek a declaratory judgment that the Town's actions violate the FHA, an injunction rescinding the challenged ordinances, and damages.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877

F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Irobe, 890 F.3d at 377 (cleaned up). If the nonmovant fails to adduce such evidence, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018). "The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence he provides on that issue is conclusive." Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez, 659 F.3d 42, 50 n.10 (1st Cir. 2011) (quoting Torres Vargas v. Santiago Cummings, 149 F.3d 29, 36 (1st Cir. 1998)).

### III.   ANALYSIS

The parties have filed cross-motions for summary judgment. The Town challenges both the Developers' standing to sue and the ripeness of their claims. The Developers limit their request for summary judgment to their familial status discrimination claims. I begin with the Town's motion because it bears on whether I have jurisdiction to consider the case. See Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013) (recognizing that ripeness challenge implicates the court's jurisdiction).

### A.   The Town's Motion for Summary Judgment

The Town argues that the Developers lack standing to sue because their proposed project fails to comply with a municipal ordinance that has nothing to do with either the moratorium or the GMO. In the alternative, the Town contends that the Developers' claims are not ripe because they have not submitted a formal site plan for approval by the Planning Board. Neither argument stands up to scrutiny.[6]

---

[6]    The Town also seeks summary judgment on the Developers' claims against the Selectboard on the ground that the complaint does not allege any actionable conduct on its part. The only action attributable to the Selectboard is a vote in favor of holding the March 2021 Town Meeting where the moratorium was put to a vote. That action cannot form the basis for FHA liability because it was a ministerial act that the Selectboard was required to take under state law upon receiving sufficient signatures to trigger the vote. See N.H. Rev. Stat. Ann. § 39:3. Because the Selectboard is not alleged to have taken any other action that could lead to independent liability under the

1.     **Standing**

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." Dep't of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019). Standing doctrine "'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong' and 'confines the federal courts to a properly judicial role.'" Id. (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)).

Standing under the FHA extends to the limits of Article III. Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972); Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 108-109 (1979).[7] To establish Article III standing, "a plaintiff must (1) present an injury that is concrete, particularized, and actual or imminent; (2) fairly traceable to the defendant's challenged behavior; and (3) likely to be redressed by a favorable ruling." Dep't of Commerce, 139 S. Ct. at 2565 (cleaned up). The first requirement, often

---

FHA, and the Developers can obtain full relief on their claims from the other defendants, the Town is entitled to summary judgment on the Developers' claims against the Selectboard.

[7]     Because Article III is the "sole requirement" for standing under the FHA, courts "lack the authority to create prudential barriers to standing" in this context. Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982).

referred to as injury-in-fact, requires the plaintiff to show "an invasion of a legally protected interest which is [both] concrete and particularized and actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (cleaned up). The second requirement—that the plaintiff's injury-in-fact is "fairly traceable" to the defendant's conduct—requires showing a "causal connection between the injury and the conduct complained of" such that the injury is "not the result of the independent action of some third party not before the court." Id. at 560-61 (cleaned up). The third requirement—whether the injury is redressable—can be satisfied only if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (cleaned up).

The Town argues that Developers cannot establish either that their claimed injury is traceable to the Town's actions or that it can be redressed by a court order. This is so, the Town claims, because another ordinance that was in place before Brookline adopted the moratorium—an ordinance that the Developers do not challenge—would have foreclosed the proposed project in any event.[8]

---

[8]     I need not determine whether the Town's standing argument is best addressed as a traceability problem or a redressability problem. Although traceability and redressability are separate components, they were initially described as "'two facets of a single causation requirement.'" Allen v. Wright, 468 U.S. 737, 753 n.19 (1984), abrogated on other grounds by Lexmark Int'l,

I am unpersuaded by the Town's standing argument because it is based on a factual premise that remains in genuine dispute. The parties devote much effort to their competing interpretations of the original WHO. The Town argues that the Developers' conceptual plan does not comply with the original WHO because it provides that any development must be situated on land within 500 feet of Route 13 and the conceptual plan placed dwellings outside this boundary. The Developers counter that the Route 13 corridor includes any parcels with frontage within 500 feet of the highway, which the conceptual plan satisfied.

The Town's standing argument fails to persuade because, even if the Town's interpretation of the ordinance is correct, a genuine dispute of material fact exists as to whether the Developers could have modified their

Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). The difference is that while traceability "examines the causal connection between the assertedly unlawful conduct and the alleged injury," redressability "examines the causal connection between the alleged injury and the judicial relief requested." Id. Because of this overlap, courts have addressed the two requirements as one when "they rise or fall together," such as "when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision." Doe v. Va. Dep't of State Police, 713 F.3d 745, 755 n.6, 756 (4th Cir. 2013) (cleaned up); see also Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 323 n.1 (4th Cir. 2002) (analyzing traceability and redressability prongs jointly "because they rise or fall together in this case"); Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997) (noting that "redressability and traceability overlap as two sides of a causation coin"). I follow the same approach in this case and analyze the Town's standing argument without taking a position on whether it goes to traceability, redressability, or both.

conceptual plan to bring the project into compliance with the ordinance. As even the Town's expert acknowledged in his report, the Developers could redesign the project to conform to the Town's reading of the WHO. See Doc. 40-6 at 17-18. To be sure, the scale of the project or the type of dwelling would need to be changed. See id. But there is evidence in the record that the Developers were prepared to make such modifications if required by the Planning Board and had even drafted alternative plans. See, e.g., Doc. 47-10; Doc. 47-30; Doc. 47-3 at 9-10, 23-26; Doc. 47-19 at 18-19, 33-34. On this record, I cannot conclude that the original WHO stood as an insurmountable barrier to the project.

The Town's only response is that the Developers lack standing because their alleged injury is their inability to build the project exactly as proposed in the conceptual plan. The Town, however, misconstrues the Developers' alleged injury. At bottom, the Developers are alleging that they want to use the property to build workforce housing and are challenging ordinances that have prevented them from doing so. The effect of the ordinances and the scope of the Developers' challenge, therefore, is not limited to the precise contours of their conceptual plan.

The Town's focus on the viability of the conceptual plan is also inconsistent with the nature and purpose of such a plan. A conceptual plan is simply a draft proposal and may differ substantially from the plan ultimately

presented in a formal application. See, e.g., Doc. 47-29 at 8; Doc. 47-13 at 33; Doc. 47-3 at 43-46. Consistent with that understanding, other courts have found standing even where a developer's project would need to be modified to conform to underlying requirements, so long as the developer presents evidence that those modifications could and would be made. See, e.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y., 689 F.2d 391, 393 n.2, 395 (2d Cir. 1982). Such is the case here.

In short, a genuine dispute of material fact exists as to whether the Developers could build a viable workforce housing project even under the Town's reading of the WHO. Therefore, I cannot say that there is an alternative barrier to the project sufficient to defeat either traceability or redressability.

The challenged ordinances, on the other hand, either were or remain "absolute barrier[s] to constructing" the type of housing that the Developers seek to build. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 261 (1977). Removing those barriers would "tangibly improve the chances of construction," Huntington Branch, 689 F.2d at 395, and would compensate the Developers for their alleged injuries, see Arlington Heights, 429 U.S. at 261. That is enough to satisfy Article III standing.

### 2.    Ripeness

The Town's ripeness challenge fares no better. The thrust of its argument is that the Developers' failure to submit a formal application to the Planning Board renders this dispute premature. The contingencies that the Town has identified, however, do not affect ripeness.

Ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" in violation of Article III's "case or controversy" requirement. Roman, 724 F.3d at 89 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)). The core question is whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" judicial review. Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)). In accordance with these principles, the plaintiffs must show that the issues raised are (1) "fit" for judicial review, and (2) that they will suffer hardship if review is denied. Reddy v. Foster, 845 F.3d 493, 501 (1st Cir. 2017). The fitness element concerns "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995) (cleaned up). This analysis typically entails consideration of "finality, definiteness, and the

16

extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Id. at 535. The hardship element looks at "whether the challenged action creates a direct and immediate dilemma for the parties." Sindicato Puertorriqueño de Trabajadores v. Fortuno, 699 F.3d 1, 9 (1st Cir. 2012) (cleaned up).

The Town does not challenge the hardship prong of the ripeness test. Instead, the Town contends that the Developers' claims are not fit for adjudication because they have failed to submit a formal project application to the Planning Board. Absent denial of an application by the Planning Board, the argument goes, there is no actual controversy surrounding the challenged ordinances because any claim that those ordinances present barriers to the Developers' project are "purely hypothetical in nature." Doc. 40-1 at 19. I disagree.

The Developers' claims are fit for judicial review because the effects of the challenged ordinances are not contingent: they prevent the Developers from pursing a workforce housing development in Brookline. The moratorium precluded the Planning Board from granting any subdivision approvals, a necessity for a project of this type. The GMO's permit limitations and phasing requirements prevent the Developers from obtaining low-income housing tax credits, which are the primary sources of funding for rental workforce housing projects. Lastly, the revised WHO prevents the Planning Board from

17

approving any workforce housing development based on its finding that
Brookline has already met its fair share of workforce housing. Because these
ordinances are final and definitive, and there is nothing contingent about
their effects on the Developers' proposed development, the instant challenge
to the ordinances is fit for adjudication.

In these circumstances, the Developers' failure to submit a formal
application for their project is of no consequence. The Town cites no authority
for the proposition that developers must submit such applications to obtain
relief under the FHA, and I have found none. Especially where it is clear that
an application would be denied, ripeness doctrine does not require litigants to
"press on meaninglessly" by going through a futile application process.
Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1452 (4th Cir. 1990);
see Sharpvisions, Inc. v. Borough of Plum, 475 F. Supp. 2d 514, 522 (W.D. Pa.
2007) ("[W]hen evaluating fitness for judicial decision, the litigants are not
required to make futile gestures to establish ripeness.") (cleaned up). It is
undisputed that the Developers' application could not have been approved
either during the moratorium or after the GMO and the WHO were passed.
Because submission of an application would have been a futile gesture, the
Developers' failure to incur the substantial cost of preparing a formal
application does not leave their claims unripe.

To the extent the Town argues that a project such as this one is subject to too many uncertainties to give rise to a ripe claim unless a formal application is submitted, that argument likewise fails. As the Supreme Court recognized in <u>Arlington Heights</u>, uncertainties such as whether a proposed project will be able to obtain financing or gain ultimate approval will not deprive the court of jurisdiction. <u>See</u> 429 U.S. at 261 (noting that "all housing developments are subject to some extent to similar uncertainties"). But where, as here, a developer has proposed a specific project and taken concrete steps to bring it to fruition, <u>see</u> <u>id.</u> at 256, spent funds pursing the project, <u>see</u> <u>id.</u>, and drafted plans for the development, <u>see</u> Huntington Branch, 689 F.2d at 395, the existence of unspecified contingencies does not render their challenge unfit for review.[9] Accordingly, the Town's motion for summary judgment must be denied.

**B.     The Developers' Motion for Partial Summary Judgment**

The Developers limit their request for summary judgment to their claims that the Town violated § 3604 of the FHA by discriminating against the Developers' prospective tenants because of their familial status. Before turning to the Developers' arguments, I provide a brief overview of § 3604.

---

[9]     Although <u>Arlington Heights</u> was decided on standing grounds, it is also relevant to ripeness because "standing and ripeness inquiries overlap." McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 69 (1st Cir. 2003).

### 1.      Protections for Familial Status Under § 3604

Section 3604(a) of the FHA states that it is unlawful to "make

unavailable or deny, a dwelling to any person because of . . . familial status."

42 U.S.C. § 3604(a). Section 3604(b) prohibits discrimination against any

person "in the terms, conditions, or privileges of sale or rental of a dwelling,

or in the provision of services or facilities in connection therewith, because of

. . . familial status." Id. at § 3604(b). Lastly, § 3604(c) makes it unlawful to

make or publish any statement "that indicates any preference, limitation, or

discrimination based on . . . familial status." Id. at § 3604(c). The statute

defines familial status as one or more minor children living with a parent,

legal guardian, or designee of a parent or legal guardian. Id. at § 3602(k).

The FHA's implementing regulations further proscribe "any conduct

relating to the provision of housing . . . that otherwise makes unavailable or

denies dwellings to persons . . . because of . . . familial status." 24 C.F.R.

§ 100.70(b). Prohibited activities under this provision include "[e]nacting or

implementing land-use rules, ordinances, procedures, building codes,

permitting rules, policies, or requirements that restrict or deny housing

opportunities or otherwise make unavailable or deny dwellings" on account of

familial status. Id. at § 100.70(d)(5). Consistent with this regulation, the FHA

has been interpreted to prohibit municipalities from using their zoning

powers to discriminate against members of a protected group relating to the

provision of housing. See, e.g., Arlington Heights, 429 U.S. at 268; Hallmark

Devs., Inc. v. Fulton Cnty., 466 F.3d 1276, 1283 (11th Cir. 2006).

The Developers assert two distinct theories of liability under § 3604(a)

and (b): (1) a disparate treatment claim (also called an intentional

discrimination claim), and (2) a disparate impact claim. See Macone v. Town

of Wakefield, 277 F.3d 1, 5 (1st Cir. 2002). Where a disparate treatment

claim is based on a law or policy that explicitly disfavors a protected group,

no separate proof of discriminatory intent is required. See Cmty. Servs., Inc.

v. Wind Gap Mun. Auth., 421 F.3d 170, 177-78 (3d Cir. 2005); Bangerter v.

Orem City Corp., 46 F.3d 1491, 1500-01 (10th Cir. 1995); see also Int'l Union,

United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson

Controls, Inc., 499 U.S. 187, 198-99 (1991). If the challenged law or policy is

neutral on its face, however, discriminatory intent must be proved through

either direct evidence of discriminatory animus or circumstantial evidence

that creates an inference of discriminatory intent under the McDonnell

Douglas burden-shifting framework. See Batista v. Cooperativa De Vivienda

Jardines De San Ignacio, 776 F.3d 38, 43 (1st Cir. 2015); see also Trans

World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). A disparate impact

claim, on the other hand, targets a law or policy that was not intended to

discriminate but that has "a disproportionately adverse effect on [a protected

group] and [is] otherwise unjustified by a legitimate rationale." Texas Dep't of

Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 524 (2015) (cleaned up).

Although the Developers base their discrimination claims under § 3604(a) and (b) on both disparate impact and disparate treatment theories, they limit their summary judgment motion to their contention that the Town engaged in impermissible disparate treatment. They then seek to establish their entitlement to summary judgment by arguing that the moratorium and the GMO are facially discriminatory and that, in any event, the record includes direct evidence of the Town's discriminatory intent. I address each theory of liability before turning to the Developers' discriminatory statements claim under § 3604(c).

### 2.    Facial Discrimination

The Developers argue that the moratorium and the GMO facially discriminate against families with children because they expressly reference school capacity as the reason for their enactment. The Town responds that the Developers' facial challenge fails because the ordinances are neutral on their face.

"A facially discriminatory policy is one which on its face applies less favorably to a protected group." Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1048 (9th Cir. 2007); see Johnson Controls, 499 U.S. at 198-99. In other words, a facially discriminatory law or policy "expressly treats someone

protected by the FHAA in a different manner than others." Bangerter, 46 F.3d at 1501; accord Cmty. House, 490 F.3d at 1050. The protected trait must be "used as the basis for different treatment" for a facial discrimination claim to succeed. 431 E. Palisade Ave. Real Est., LLC v. City of Englewood, 977 F.3d 277, 285 (3d Cir. 2020) (emphasis in original).

Because the focus in a facial challenge "is on the explicit terms of the discrimination," a showing of discriminatory motive is not required. Wind Gap, 421 F.3d at 177 (quoting Johnson Controls, 499 U.S. at 199). Stated differently, "direct evidence of intent is supplied by the policy itself." 431 E. Palisade Ave., 977 F.3d at 284 (cleaned up). Indeed, even a benevolent motive cannot save a facially discriminatory policy from invalidity. See Johnson Controls, 499 U.S. at 198-99.

A facially discriminatory classification can also arise when a law or policy "treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." Pac. Shores Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Accordingly, "a technically neutral classification" cannot be used "as a proxy to evade the prohibition of intentional discrimination." Wind Gap, 421 F.3d at 177-78 (quoting McWright v. Alexander, 982 F.2d 222, 228 (7th Cir. 1992)). Examples of such

classifications include using gray hair or Medicare status as proxies for age, or targeting service dogs or wheelchairs as proxies for disability. Id. "Generally applicable regulations, even those that expressly include protected classes or their proxies, in contrast, do not discriminate on their face, unless the different treatment was necessarily" based on a protected trait. 431 E. Palisade Ave., 977 F.3d at 285 (cleaned up).

Although the Developers argue otherwise, the moratorium and the GMO do not, on their face, apply differently to families with children, either directly or by proxy. With one exception addressed below, the ordinances apply evenhandedly to all who wish to build residential housing in Brookline, including adults-only households and families with children. Simply put, families with children are not singled out for differential treatment in the ordinances. As another district court explained in an analogous case, "the challenged land use ordinances control residential growth; they, however, neither preclude families with children from existing housing nor foreclose future development of housing for this protected group in [the town]." Eastampton Ctr., L.L.C. v. Twp. of Eastampton, 155 F. Supp. 2d 102, 118 (D.N.J. 2001). During the moratorium, families with children, like all others, remained eligible to buy or rent existing housing units in Brookline. After the enactment of the GMO, development of housing for this protected group is subject to the same rules that apply to adults-only households. Thus, the

ordinances, on their face, are generally applicable and operate in a facially neutral manner by reducing allowable residential construction for all.

The one exception to the general applicability of the moratorium and the GMO is their express exemption of housing for older persons. Contrary to the Developers' position, however, that exemption does not show that the ordinances necessarily target families with children.

When Congress amended the FHA to prohibit discrimination based on familial status, it also "recognized the effect these prohibitions would have on retirement communities and created exemptions in the FHA for qualified 'housing for older persons.'" Balvage v. Ryderwood Improvement & Serv. Ass'n, Inc., 642 F.3d 765, 769 (9th Cir. 2011) (citing 42 U.S.C. § 3607(b)). "The housing for older persons exemptions permit communities satisfying certain requirements to discriminate on the basis of familial status." Id. As the Ninth Circuit has recognized, "the government's legitimate interest in preserving and promoting housing for older persons" underlies the FHA's exemption. Taylor v. Rancho Santa Barbara, 206 F.3d 932, 936 (9th Cir. 2000) (holding that the exemption is sufficiently related to this interest to insulate it from an equal protection challenge). Consistent with the exception's purpose, the Department of Housing and Urban Development (HUD) has interpreted it to extend to "municipally zoned senior housing." See Putnam Fam. P'ship v. City of Yucaipa, 673 F.3d 920, 933 (9th Cir. 2012) (deferring to the HUD's

interpretation in 24 C.F.R. § 100.304 allowing such housing as a reasonable construction of the FHA).

Given the FHA's express exemption for housing for older persons, the Town's decision to exempt such housing from the moratorium and the GMO does not establish that the ordinances facially discriminate against families with children. Brookline's zoning ordinance requires housing for older persons to satisfy the prerequisites established by the FHA. See Doc. 40-4 at § 2202.01. Exempting this type of housing from certain restrictions is consistent with the purpose of the FHA to promote senior housing and is a legitimate exercise of Brookline's zoning powers. Cf. Putnam, 673 F.3d at 933. The fact that this exemption applies to a type of housing where children are unlikely to reside, thus, does not render the challenged ordinances discriminatory on their face.[10]

Although the challenged ordinances operate in a facially neutral way, the Developers argue that they are invalid on their face because their stated purpose is discriminatory. The Developers do not cite any case law for the proposition that an ordinance or a statute of neutral applicability can be

---

[10]    The Developers also note that the moratorium permitted the Planning Board to exempt from its provisions housing that would have minimal impact on school capacity. Absent evidence that this provision was used to selectively exempt adults-only households from the moratorium, I cannot say that the moratorium, on its face, was limited to housing for families with children.

26

rendered facially discriminatory by the inclusion of a statement of purpose. Indeed, the Supreme Court has instructed otherwise when it stated in a different context that "the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or., 511 U.S. 93, 100 (1994). As here, the statutory purpose in Oregon Waste was stated in the text of the statute. See id. Although the stated purpose in that case was cited to show that the law was not facially discriminatory, the Court did not cabin its statement of the law to that context or otherwise suggest that a discriminatory purpose would be treated any differently in a facial challenge.

But even if the Developers' proposition is correct, the stated purpose here is not facially discriminatory. Although they acknowledge that the purpose language of the moratorium and the GMO does not mention families with children, the Developers argue that the Town's stated concern about the impact of residential development on school services is a mere proxy for familial status discrimination. I disagree.

Unlike in cases where courts have found facial discrimination by proxy, school impact is not merely a "technical" substitution for families with children. Cf. McWright, 982 F.2d at 228. Although there is a strong correlation between the two, "as a matter of pure logic," they "remain analytically distinct concepts." See Kentucky Ret. Sys. v. E.E.O.C., 554 U.S.

27

135, 143 (2008) (cleaned up). The Supreme Court held in <u>Kentucky Retirement System</u> that pension status is not a proxy for age in part because "one can easily conceive of decisions that are actually made 'because of' pension status and not age, even where pension status is itself based on age." <u>Id.</u> Using a hypothetical, the Court reasoned that eligibility for a pension is based on age, but the ability to receive a pension does not kick in until the employee retires. <u>See</u> <u>id.</u> Thus, payment of a pension is a function of both age and retirement status. <u>See</u> <u>id.</u> For this reason, the Court explained, it could be said that an employer's decision to pay an employee a pension is not "because of" the employee's age, but rather because of his retirement status, even though the two are inextricably linked. <u>See</u> <u>id.</u>; <u>see also</u> <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'").

Applying the same reasoning here illustrates the distinction between school capacity and school-age children. School capacity is commonly understood to refer to the number of students who can be accommodated in a particular school system. In other words, school capacity is a function not only of the number of enrolled students but of school resources, such as school facilities, student-to-teacher ratios, and staffing levels, to name a few.

Therefore, it is easy to conceive of decisions that are actually made "because of" school capacity and not children. For example, even where the number of enrolled students stays the same over a two-year period, a school may go from being below capacity in year one to overcapacity in year two if enough teachers quit their jobs in year two and cannot be replaced. As this example illustrates, I am not persuaded that the ordinances, on their face, discriminate against families with children merely because they invoke school capacity concerns as their justification.

### 3. Direct Evidence of Discriminatory Intent

The Developers argue in the alternative that they are entitled to summary judgment even if the moratorium and the GMO are facially neutral because the record contains direct evidence that the Town adopted them with "an intent to limit housing opportunities for families with children." Doc. 50 at 9. This argument fails because it is based on mistaken premises.

The Developers assume that statements in the ordinances and by members of the Planning Board that the Town adopted the ordinances in part to manage growth in Brookline's schools qualify as direct evidence of discriminatory animus. But this assumption is misplaced. New Hampshire law recognizes that local communities have a legitimate interest in managing growth in their schools. See Riverview Park, Inc. v. Town of Hinsdale, 113 N.H. 693, 694 (1973); Ettlingen Homes, Inc. v. Town of Derry, 141 N.H. 296,

299 (1996). Thus, the Town's statements that the ordinances were meant to further this interest do not necessarily reflect an animus against families with children. Direct evidence in a discrimination case "is evidence which, in and of itself, shows a discriminatory animus." Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., 999 F.3d 37, 51 (1st Cir. 2021). (quoting Jackson v. Harvard Univ., 900 F.2d 464, 467 (1st Cir. 1990)). Judged by this standard, the statements the Developers cite do not qualify as direct evidence because they do not, in and of themselves, reveal an animus against families with children. See Arbor Bend Villas Hous., L.P. v. Tarrant Cnty. Hous. Fin. Corp., 2005 WL 548104, at *6 (N.D. Tex. Mar. 9, 2005) (rejecting a claim that "mere consideration of school impact automatically evidences familial-status discrimination").[11]

The Developers are also mistaken when they assume that they are entitled to prevail if the statements they cite qualify as direct evidence. A plaintiff must do more than merely point to direct evidence in the record to

---

[11]    To the extent the Developers contend that the Town's statements qualify as direct evidence of discrimination by proxy, they have not cited a single case where a court made a similar determination. This is unsurprising, considering that proxy classifications necessarily entail the drawing of inferences that the technically neutral language is a substitute for protected status. Cf. Fernandes v. Costa Brothers Masonry, Inc., 199 F.3d 572, 581-83 (1st Cir. 1999) (describing the traditional view of direct evidence as "evidence which, if believed, suffices to prove the fact of discriminatory animus without inference, presumption, or resort to other evidence"), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

prevail as a matter of law on a disparate treatment claim. It is true that a court will sometimes need to distinguish between direct and circumstantial evidence when considering whether the plaintiff has made out a prima facie case of discrimination. For example, if a claim is based entirely on circumstantial evidence, the plaintiff's prima facie case will be assessed using the McDonnell Douglas burden-shifting framework. See, e.g., Taite v. Bridgewater State Univ. Trs., 999 F.3d 86, 93 (1st Cir. 2021). By contrast, "[i]f the plaintiff provides direct evidence of discrimination, the issue may be put to a finder of fact without further ado." Zampierollo, 999 F.3d at 51 (cleaned up). But while a plaintiff's ability to use direct evidence as a shield against a defendant's motion for summary judgment is well established, the Developers have not identified a single case in which a court has held that a plaintiff is entitled to prevail on her own motion for summary judgment merely by citing to direct evidence that the defendant acted with discriminatory intent. This distinction is critical because, given that the Developers bear the ultimate burden of persuasion on their disparate treatment claims, the record must be "conclusive" to entitle them to summary judgment. See Juarbe-Jimenez, 659 F.3d at 50 n.10. "Determining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429

31

U.S. at 266. In a case like this, which involves facially neutral ordinances that were ostensibly adopted to achieve a legitimate government purpose, the Developers are not entitled to prevail merely by pointing to statements in the record that the Town adopted the ordinances in part to achieve that purpose.

### 4.    Discriminatory Statements

The Developers argue that they are entitled to summary judgment on their § 3604(c) claim because the statements attributable to the Town reveal the Town's aversion to families with children. I disagree.

The FHA prohibits the making or publishing of any statement in connection with housing that "indicates any preference, limitation, or discrimination" based on familial status. 42 U.S.C. § 3604(c). A statement is prohibited under § 3604(c) if it "suggests to an ordinary reader that a particular protected group is preferred or dispreferred for the housing in question." Jancik v. Dep't of Hous. & Urb. Dev., 44 F.3d 553, 556 (7th Cir. 1995) (quoting Ragin v. N.Y. Times Co., 923 F.2d 995, 999 (2d Cir. 1991)) (cleaned up); see also Soules v. U.S. Dep't of Hous. & Urb. Dev., 967 F.2d 817, 825 (2d Cir. 1992); Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644, 646 (6th Cir. 1991); United States v. Hunter, 459 F.2d 205, 215 (4th Cir. 1972). Although discriminatory intent is not necessary to establish a violation of § 3604(c), evidence of the speaker's intent and the context in which the statement was made can help a factfinder

32

determine "the way an ordinary listener would have interpreted it." Soules, 967 F.2d at 825; see Ragin, 923 F.2d at 1000 ("[T]he intent of the creator of an ad may be relevant to a factual determination of the message conveyed.").

Bearing in mind that the Developers bear the burden of proof on this issue, I cannot say that the only conclusion a reasonable factfinder could draw from the record is that the challenged statements disfavor families with children. The statements at issue express concerns about Brookline's ability to provide adequate school services and the strain on school capacity that will result from rapid population growth. They appear in both the ordinances and in comments made by various Brookline officials.[12] Such statements could be taken at face value as merely expressing concerns over a service—public education—that each municipality must provide. And as I have explained, school capacity and familial status are analytically distinct concepts. An ordinary reader, thus, may not necessarily draw a connection between the Town's capacity to provide adequate public education and a desire to "exclude

---

[12] In its motion for summary judgment, the Town assumes that the Developers are challenging statements made by Brookline residents and argue that the claim fails because those statements are not attributable to the Town. That argument is a non-starter because the Developers' claim, as presented in their motion, is based on statements that are attributable to the Town. To the extent the complaint also cites to statements made by residents, the Developers suggest that those statements also could be actionable because the residents were acting as members of Brookline's legislative body when they made those statements. I do not address the actionability of the residents' statements because that issue was not adequately briefed.

children" or "stop children" from moving to Brookline, as the Developers contend. Indeed, an ordinary reader may construe the challenged statements as expressing a legitimate concern for the quality of education for all families, both the current residents of Brookline and new families with children looking to move there. Because the evidence does not conclusively show that the challenged statements indicate a preference against families with children, the Developers cannot prevail on their § 3604(c) claim at this stage.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Town's motion for summary judgment (Doc. 40) is granted only as to the claims against the Selectboard and is otherwise denied. The Developers' partial motion for summary judgment (Doc. 42) is likewise denied. The parties' motions to exclude expert testimony (Docs. 53 and 54) are denied without prejudice as moot.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

July 7, 2023

cc:    Counsel of record